Filed 5/6/14  In re Andrew S. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANDREW S., JR., et al., Persons Coming Under the Juvenile Court Law. | B248693 (Los Angeles County Super. Ct. No. CK73994) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANDREW S., SR., Defendant and Appellant. | |

APPEAL from findings and orders of the Superior Court of Los Angeles County. Veronica McBeth, Judge.  Affirmed.

Megan Turkat Schirn, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Andrew S., Sr. (father) appeals from the juvenile court's jurisdictional findings and dispositional orders. He contends that there was insufficient evidence to sustain the juvenile court's finding that his occasional marijuana use impacted his ability to care for his children, Andrew S., Jr. (Andrew, born Mar. 2011) and Angelina S. (Angelina, born Oct. 2012) (collectively the minors). He also argues that there was insufficient evidence to sustain the allegation that he knew or reasonably should have known of Angelica C.'s (mother) relapse. Further, he asserts that insufficient evidence supports the juvenile court's order requiring him to complete a parenting program, to submit to drug tests, and to participate in monitored visits with the minors.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prior Dependency History*

On August 14, 2008, the Los Angeles County Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code section 300[1] petition on behalf of Samantha C. (Samantha), mother's oldest child; the petition was filed under subdivisions (a), (b), and (g), based upon mother's use of amphetamine, methamphetamine, and marijuana; domestic violence between mother and Samantha's father, O.M.; and O.M.'s failure to provide the necessities of life for Samantha.

Mother failed to reunify with Samantha. Her case was closed on September 20, 2010, with a family law order giving O.M. sole physical and legal custody of Samantha and mother monitored visitation.

*Detention Report*

In October 2012, mother gave birth to Angelina. Both mother and Angelina tested positive for methamphetamine. The following day, the minors were detained.

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Mother's Statements

During her interview with the social worker, mother said that she knew DCFS would be detaining her newborn child. She admitted that she had "'messed up'" and used methamphetamine three days prior to giving birth. Mother said that she was "hanging out with a friend" and had "no idea why she decided to use drugs." Mother also disclosed that she had used drugs in May 2012, after she found out that she was pregnant.

Mother admitted that she had a problem with drugs in her past; she had a history of marijuana and methamphetamine use. She had been ordered by the juvenile court to attend a drug rehabilitation program based upon Samantha's dependency case. Although she enrolled in a program, she did not complete it. She claimed that DCFS contributed to her drug usage by detaining Samantha.

Mother further disclosed that she would be turning herself in for incarceration to the Pasadena criminal court by November 30, 2012, for charges of grand theft.

Father's Statements

Father reported that he was unaware of mother's drug usage. He said that mother had been attending school to become a licensed vocational nurse and "had been clean." He claimed only to have found out that mother had used drugs again because Angelina had been born with a positive toxicology screen for methamphetamine.

Father claimed that he quit using marijuana approximately three months ago. He had been unemployed for the past year. He was unable to provide a current address or any prior address. He also did not remember his telephone number. He denied having any criminal arrest history, but he said that he would be turning himself in for incarceration through the Pasadena court in the next couple of weeks. He did not recall what the charges were. In response to the social worker's inquiry regarding whether father was turning himself in for the same crime as mother, he said it was "for the same thing, theft."

He was sad that mother had used drugs while pregnant, but he and mother wanted to remain a family. He wanted the minors returned to mother's care and custody.

Maternal Grandmother's Statements

The maternal grandmother could not believe that mother "did this again." She had not suspected that mother was using drugs; she thought mother appeared to be "on the right path." She was unaware if mother had received consistent prenatal care. She reported that mother and Andrew had moved into her home about two months prior. She only found out that mother was using drugs after Angelina was born.

Maternal Aunt's Statements

The maternal aunt informed the social worker that she and her one-year-old child resided with the maternal grandmother, mother, and Andrew. She "had a small suspicion" that mother might have been using drugs. However, she never saw mother use drugs or act differently since living with the maternal grandmother. She was unable to elaborate why she was suspicious that mother was using drugs. She thought mother was a good mother to Andrew.

Hospital Social Worker's Statements

The hospital social worker informed the DCFS social worker that mother admitted to using drugs on at least two occasions after knowing that she was pregnant. The last time mother used drugs was three days prior to giving birth. She was inconsistent with her prenatal care appointments and missed several of her appointments in July and August 2012. And, mother tested positive for amphetamine on May 21, 2012.

Detention

DCFS took the minors into protective custody. Andrew was placed in a foster home. Angelina was scheduled to be released from the hospital in a couple of days and would be placed in a foster home.

*Section 300 Petition*

On October 17, 2012, DCFS filed a section 300 petition alleging that Angelina had been born with a positive toxicology screen for amphetamine and methamphetamine; mother had a substance abuse history, was currently using methamphetamine and amphetamine, and Samantha had been a dependent of the juvenile court because of

4

mother's drug use; and father had a history of drug use and was a current user of marijuana.

*Jurisdiction/Disposition Report*

DCFS reported that mother had a criminal history.

Father too had a criminal history. His case had been in "[w]arrants [s]tatus" since August 3, 2012, when he failed to appear for a court date. Father informed the dependency investigator that he was aware of the active warrant for his recent arrest and that he planned to turn himself in after the next juvenile court hearing date.

Mother admitted to a history of drug abuse.

Mother had never seen father smoke marijuana, but she knew that he had used it. About three months prior, father had "'hit some resin of whatever was left.'" Regarding marijuana, mother said that she and father "'never really talked about it and it wasn't around or a part of [their] lives.'" She did not believe that father's marijuana use affected his parenting. According to mother, father is very shy and mostly lets mother take care of everything. They had talked about him stepping up as a father and being able to do things without her help. He loved his children and played well with Andrew.

Father said that he did not find out about mother's drug use until his daughter was born. The doctor had informed him that "'the test was dirty.'" Father was surprised that DCFS took the minors into protective custody. Mother was crying, and she admitted to using methamphetamine when she "ran into 'some old friends.'" Father said that he was at the paternal grandmother's home when mother used methamphetamine. He indicated that mother did not tell him about the drug use until he was at the hospital.

Father knew that mother had a history of drug use, and he knew that mother had lost Samantha as a result of her substance abuse. He and mother had been dating for three years, but he had known her for eight years because they were neighbors. He did not know when mother began using drugs, but he knew that she had used methamphetamine. He did not think that she used marijuana. Father said that he was unaware of mother's positive drug test in May 2012. He indicated that he attended prenatal visits with mother, but he must not have been there for the visit when she tested

5

positive. He did not know about mother's methamphetamine use the day before she gave birth. He was aware that the probation department had asked mother to complete a substance abuse program and was with mother when she was in her last outpatient program.

Father disclosed that he had a history of marijuana use and first tried the drug at the age of 16. He did not have a marijuana license. He did not use marijuana every day, but he would use it "socially with his friends." He thought that he had last used on October 10, 2012, but "only used a little," which was why he thought it did not show up on his drug test. He denied ever using marijuana or any other type of drug around the children.

He currently resided with the maternal grandmother. He did not have a job or income, so he planned to apply for general relief. He needed a job and his license.

Father tested negative for drugs on October 15, 2012.

The maternal aunt informed the dependency investigator that she knew mother had previously used drugs and that her drug of choice was methamphetamine. The maternal aunt said that mother lost custody of Samantha, but faithfully attended monitored visits every Tuesday. She was unaware if mother had used marijuana and she did not know how recently mother had used drugs. She said that mother did not bring the drugs around the children.

The maternal aunt had no concerns about father; she had never known him to use marijuana or any other type of drug. She said that father helped with Andrew by changing his diaper and feeding him. Despite mother being gone, father continued to reside with her and the maternal grandmother, and he never caused any problems.

The foster mother was concerned that the family did not set limits for Andrew during visits. They constantly brought him junk food. Although father played well with Andrew, he never told Andrew anything when he misbehaved or ran around. He appeared not to know what to do when Andrew had a tantrum.

DCFS recommended that father enroll in a fatherhood group, but he felt that he did not need any type of parenting class; the juvenile court had not ordered him to

6

participate in one. However, during monitored visits, DCFS observed that father had limited knowledge about feeding and disciplining Andrew. When father asked about how he previously took care of Andrew, he had limited responses. DCFS noted that Andrew spoke and understood Spanish, but father did not speak Spanish, so it was unknown how much father could communicate with his son. DCFS recommended that father participate in a fatherhood group because he was a new father with two very young children; the group would help him become a better parent. Furthermore, because the children were being referred to the Regional Center for having some possible developmental delays, father's participation in a fatherhood group could help him learn how to care for his children's special needs.

DCFS reported that father did not appear to understand the effects of marijuana, a mind altering substance, when he has two very young children. Thus, DCFS recommended that father continue to randomly drug test and complete a program if he tested positive for drugs.

*First Amended Section 300 Petition; Hearing*

On or about December 3, 2012, DCFS filed a first amended section 300 petition, adding language to counts b-1 and b-2 that father knew or reasonably should have known about mother's substance abuse and father failed to protect the minors.

At the hearing, the juvenile court ordered father to test on demand.

*Last Minute Information for the Court (Feb. 25, 2013)*

The dependency investigator reported that she met with mother on February 5, 2013. She was doing well in her program at Tarzana Treatment Center. She expected to complete the program by April 1, 2013. She wanted to extend her stay for an additional six months to help her complete school and get a job. While she tested negative for drugs on December 21, 2012, and January 17, 2013, she failed to test on December 4, 2012, and January 7, 2013.

Father told the dependency investigator that he turned himself in to clear his warrant, and he remained incarcerated for a few days. He was arrested on December 15, 2012. He was released for "work release" and needed to complete 32 days of work

7

before his criminal case "cleared up." If he did not complete his work release, he would have to go back to jail.

He had not enrolled in parenting education, counseling, or any other tests. He said that he was calling daily to drug test, but he did not have an explanation for missing a drug test on January 29, 2013. He visited the children that day, but he did not know that he had missed a drug test. He had also missed a drug test on November 28, 2012. But, he tested negative for drugs on December 6, 2012.

Father missed the January 20, 2013, visit with the minors and did not call to cancel, so the children and foster parents were waiting at the church for father. On February 5, 2013, the dependency investigator went to observe a family visit, which was monitored by a church volunteer. The parents brought healthy snacks for Andrew and fed and changed the diapers of both children. Andrew enjoyed playing with the toys in the large children's room. The parents held Angelina or placed her in the swing seat. The parents said that they enjoyed their visits at the church visiting centers. They were sometimes late because of the bus; but, they would try to borrow someone's cellular telephone on the bus to call and let the foster parents know that they were on their way.

Attached to the Last Minute Information for the Court was the Multi-Disciplinary Assessment Team (MAT) report. Mother informed the MAT assessor that father lived with her and the maternal grandmother until a few months prior to November 2012. The maternal grandmother expressed a desire for father to work and improve his life following a police raid that occurred due to stolen merchandise in the home. After that incident, father moved into a friend's home.

Mother had struggled with drug issues since she was 15 years old. While father previously engaged in marijuana use, he had no history of any other drug or alcohol abuse problems.

The foster mother informed the MAT assessor that father visited weekly with no concerns. During one visit, Andrew engaged in tantrum-like behavior. Eventually, he was able to visit with father and had less tantrums. Andrew tended to engage with father and father appeared to be able to redirect Andrew's low frustration tolerance by engaging

8

him in activity.  Father appeared to be attuned to Andrew, but showed very limited interaction with Angelina.  When father tried to engage Angelina, Andrew got frustrated and would yell to redirect attention back to him.  The MAT assessor observed that when Andrew cried, father easily and immediately soothed him.  Father was very loving to Andrew and provided him with physical affection; he did not display such affection to Angelina.  Ultimately, Andrew recognized father as his father and was able to establish good eye contact and engage in reciprocal interactions.  The MAT assessor opined that it would be beneficial for father to be able to bond more with Angelina as he appeared to have a clear bond with Andrew.

The MAT assessor reported that father needed to be able to support his children's healthy growth and development.  She recommended that father attend parenting classes in order to identify ways to address the behaviors of his children with unique needs and to attend regular drug testing as requested.  Father was provided with referrals, but he refused to participate in parenting education.

The MAT assessor noted that Andrew had no major medical concerns.  However, he had some communication delays and he was unable to say any words coherently.  The MAT assessor recommended that Andrew be evaluated by the Regional Center to address his delays in communication.  The foster mother informed the MAT assessor that Angelina had tremors and shaking in her arms and legs as a result of her drug exposure in utero.  She recommended that Angelina be referred to the Regional Center for an evaluation to ensure that she progresses developmentally despite being drug-exposed.

*Last Minute Information for the Court (Mar. 1, 2013)*

The dependency investigator met with father at the Men's Central Jail.  He stated that he had been incarcerated on February 11, 2013, because he did not comply with his work release.  As a result of his incarceration, he had not seen the minors since the first week of February.  He did not know when he would be released, but he planned to return to the maternal grandmother's home and try to do better.

The foster mother said that the children were "doing great" and Andrew had been greatly improving his behavior and speech.

9

*Adjudication Hearing (Mar. 1, 2013)*

The juvenile court sustained counts b-2[2] and b-3[3] of the amended section 300 petition. In so doing, the juvenile court stated that it was concerned about father having some missed drug tests.

The juvenile court declared the minors dependents of the court and ordered them removed from the parents' custody. It ordered reunification services for father, including parenting education and a fatherhood class, and random drug testing. Father was granted monitored visits two to three times a week for two to three hours minimum, with discretion to DCFS to liberalize visitation.

Father's timely appeal ensued.

## DISCUSSION

I. *Substantial Evidence Supports the Juvenile Court's Jurisdictional Findings*

A. <u>Standard of Review</u>

As the parties agree, we review the juvenile court's order for substantial evidence. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.)

---

[2]     Count b-2 provides, in relevant part that mother "has a history of illicit drug use which interferes with mother's ability to provide regular care for the children. The mother used illicit drugs during her pregnancy with the child. . . . [[B]oth the mother] and [Angelina] had. . . positive toxicology screens for amphetamine and methamphetamine at [Angelina's] birth. On 5/12/2012, . . . mother had a positive toxicology screen for amphetamine. . . . Samantha . . . was a dependent of the Court, due to mother's illicit drug use. [Father] knew or reasonably should have known of the mother's substance abuse and the father failed to protect the children. The mother's illicit drug use and the father's failure to protect the children endangers the children's safety and places the children at risk of harm."

[3]     Count b-3 provides, in relevant part, that father "has a history of illicit drug use and is a current abuser of marijuana, which renders the father incapable of providing regular care for the children. The father's illicit drug use endangers the child's physical health and safety and creates a detrimental home environment, placing the children at risk of physical harm and damage."

10

B. <u>Analysis</u>

"The purpose of section 300 'is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.' [Citation.]" (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599.)

With that in mind, section 300 provides, in relevant part: "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] (b) The child has suffered, or there is a *substantial risk* that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b), italics added.)

To find a minor a person described in section 300, subdivision (b), there must be proof of neglectful conduct, causation, and a substantial risk of serious physical harm. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

Here, there is ample evidence that the minors were at a substantial risk of serious physical harm as a result of father's failure to protect. Certainly, Angelina was at substantial risk of harm as a result of father's failure to protect—mother used drugs when she was pregnant with Angelina; in fact, she was born with a positive toxicology screen.

Father complains that it was unreasonable to conclude that he knew or should have known about mother's drug use. He is mistaken. There was ample evidence that father knew about mother's history of using methamphetamine. He told the dependency investigator of mother's history of drug use, and he knew that mother had lost custody of

11

Samantha as a result of her substance abuse. He also knew that mother was supposed to complete a drug abuse program. Moreover, he was with mother when she was in her last outpatient program and therefore knew or should have known that she was terminated from that program as a result of a positive drug test, demonstrating that she had relapsed.

*In re James R.* (2009) 176 Cal.App.4th 129 is distinguishable. In that case, the mother had a negative reaction to taking ibuprofen and drinking beer. (*In re James R.*, *supra*, at p. 136.) Here, mother was abusing amphetamine and methamphetamine while she was pregnant, causing the infant to have tremors and shaking in her arms and legs. Despite this evidence, after the children were taken into protective custody, father still believed that the children should be returned to mother's care and custody. Under these circumstances, there is a substantial risk of serious physical harm to the minors as a result of father's failure to protect them from mother's substance abuse.

Additionally, substantial evidence supports the juvenile court's findings regarding father's marijuana use.[4] He had used marijuana since the age of 16; he never had a marijuana license, but would use "socially with his friends." He last used on October 10, 2012. He missed his random drug tests on November 28, 2012, and January 29, 2013, without explanation. And, his recurrent substance abuse resulted in his failure to fulfill his major role obligations. He did not have employment for the past year. He was unable to fulfill his work release, which would have allowed him to be released from custody much earlier. He was late for visits with the minors. He was unable to provide a current address or any prior address to the social worker; he could not remember his telephone number. And, he had legal problems, including a criminal history, a case in "warrant status," and a recent police raid for stolen property. It follows that the juvenile court had prima facie evidence of father's instability to provide regular care to his two young

---

[4] It is well-established that we may affirm a juvenile court's jurisdictional findings if substantial evidence supports any of the counts involving the children. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875–877.) Thus, there is jurisdiction over the minors even if there is substantial evidence to support only one of the two allegations sustained against father. (*Id*. at p. 876.)

children, resulting in a substantial risk of serious physical harm. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 453 [although the use of medical marijuana, without more, cannot support a jurisdiction finding, here there is substantial evidence of the "more" necessary to support jurisdiction].)

Father's reliance upon *In re Drake M.* (2012) 211 Cal.App.4th 754 is misplaced. In that case, the Court of Appeal determined that the child was not at substantial risk of harm as a result of the father's use of medical marijuana. After all, the evidence there showed that the father had fulfilled his work obligations; the father had a valid recommendation from a physician to use marijuana to treat chronic knee pain; the father did not have a criminal history; and there was plenty of food in the home and the utilities were working. (*Id.* at pp. 767–768.) Here, father has not been employed for a year and could not fulfill his work release obligations; he had not been prescribed marijuana by a physician; and he has an extensive criminal history.

## II. *The Juvenile Court Made the Correct Disposition Orders*

The juvenile court "has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order" accordingly. *(In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) "On appeal, this determination cannot be reversed absent a clear abuse of discretion." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.)

The juvenile court did not err in ordering father to attend a fatherhood program and participate in random drug tests. He admitted to using marijuana since the age of 16. He did not have a marijuana license and would use with friends. He used on October 10, 2012, and failed to drug test at least twice, without explanation. It follows that the juvenile court did not abuse its discretion in ordering father to participate in random drug testing.

Ordering father to participate in parenting education was proper as well. DCFS observed during monitored visits that father had limited knowledge about feeding and disciplining Andrew. When father was asked how he previously took care of Andrew, he had limited responses. Mother also had discussed with father his need to step up as a

father and be able to do things without her help. The MAT assessor recommended that father attend parenting classes in order to identify ways to address the behaviors of his children with unique needs; Andrew needed to be evaluated by the Regional Center to address his delays in communication, and Angelina needed an evaluation because she had been exposed to drugs in utero.

Father's reliance upon *In re Jasmin C.* (2003) 106 Cal.App.4th 177 is misplaced. In that case, a nonoffending parent was improperly ordered to attend a parenting class (*In re Jasmin C.*, *supra*, at p. 181); here, father, is offending—as set forth above, there is evidence of his failure to protect, his substance abuse, and his extensive criminal history.

Similarly, the juvenile court did not err in limiting father to monitored visitation. The visitation order was made in light of the entire record, including father's criminal history (even if that history was not a basis for dependency jurisdiction). (§ 361.2.) And, as set forth above, father failed to protect the minors from mother's substance abuse; even after he found out about mother's relapse, he still wanted the children returned to her custody. He also was an abuser of marijuana. And, he has an extensive criminal history. At the time the case came before the juvenile court, he had an active warrant for his arrest, and he was incarcerated twice during these proceedings. In fact, he was incarcerated during the time of the jurisdictional hearing. He also endangered the children prior to DCFS's involvement by bringing a police raid into the family home because he had stolen merchandise in the home. Finally, he was uncooperative with DCFS by refusing to participate in parenting education. Taken together, all of this evidence supports the juvenile court's order for monitored visitation.

# DISPOSITION

The juvenile court's findings and orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
                  ASHMANN-GERST


We concur:


_____, P. J.
      BOREN


_____, J.*
      FERNS

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.